**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COLLEEN MULCAHY**,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17 C 8235 |
| v. | ) | |
| | ) | Magistrate Judge M. David Weisman |
| COOK COUNTY, COOK COUNTY | ) | |
| SHERIFF'S DEPARTMENT, COOK | ) | |
| COUNTY DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Colleen Mulcahy brings this suit against defendants Cook County, Cook County Sheriff's Department ("CCSO"), and Cook County Department of Corrections ("CCDOC"), alleging claims under the American's with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq*. Before the Court is defendant CCSO's motion for summary judgment [76]. For the reasons set forth below, the motion is granted in part and denied in part.

## FACTS

Plaintiff began her employment with the CCSO in 2003 as a corrections officer with the CCDOC. (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 1.) She currently serves as a deputy sheriff at the Cook County Jail (the "Jail.") (*Id*. ¶ 39.) Defendant CCSO provides various enforcement and correctional services, including oversight of the CCDOC and operations of the Jail. (*Id*. ¶ 2.)

Plaintiff alleges that she has a severe case of Crohn's disease and that she is a qualified individual with a disability under the ADA. (*Id*. ¶ 7.) On December 2, 2016, plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), and she received her right to sue letter on August 17, 2017. (*Id*. ¶¶ 11-12.). Plaintiff then filed this suit in which she alleges claims of (1) failure to accommodate; (2) discrimination; and, (3) retaliation. (*Id*. ¶ 8.)

### *The Collective Bargaining Agreement and CCSO Policy*

The International Brotherhood of Teamsters, Local Union 700 ("Teamsters Local 700") represents plaintiff and other correctional officers/deputy sheriffs for collective bargaining purposes. (*Id*. ¶ 13.) The CCSO and Teamsters Local 700 entered into a Collective Bargaining

Agreement ("CBA") which governs the employment relationship between the CCSO and CCSO employees. (*Id.* ¶ 14.)

The CBA provides that the CCDOC will maintain at least forty-five (45) positions to assign to employees with medical restrictions or other limitations. (*Id.* ¶ 37.) None of these forty-five positions require an officer to directly oversee inmates unless another officer is also assigned to work in that position. (*Id.* ¶ 38.)

The CCSO has a written policy and practice to help employees obtain job accommodations related to a disability or medical condition. (*Id.* ¶ 31.) When an employee requests an accommodation, the employee must complete and submit a Reasonable Accommodation Request Form. (*Id.* ¶ 34.) She must also submit a form from her treating physician. (*Id.*)[1] After an employee submits these forms, Rebecca Reierson, who is the Director of Employee Services for the CCSO and oversees accommodation requests for the CCSO, will contact the employee as well as CCDOC's operations personnel to determine whether there is a reasonable accommodation that would help the employee perform the essential functions of the job in which she requests an accommodation. (*Id.* ¶¶ 4, 35.) An employee's requested accommodation will be provided if it is possible and reasonable. (*Id.* ¶ 36.) If not, the CCSO will consider other options for the employee. (*Id.*)

### A.    *Compound-wide bid*

The CCDOC completes a compound-wide bid every even year. (*Id.* ¶ 21.) During this process, all positions within the Department of Corrections are identified. (*Id.*) Thousands of correctional officers, by seniority, select their desired shift, detail, and division and/or unit. (*Id.*) A "division" refers to a physical building that houses a certain type of inmate. (*Id.*) A "detail" refers to the days off an officer gets each week. (*Id.*) A "shift" refers to the time an officer works. (*Id.*) An "assignment" refers to a position or post that an officer works at any given time within a division. (*Id.* ¶¶ 21-22.)[2]

The CBA provides that officers are not allowed to participate in the formal compound-wide bid process if they have certain designations, including "duty-injury, disability, maternity leave, leave of absence, or suspension of thirty (30) days or more." (*Id.* ¶ 23; Def.'s LR 56.1(a) Stmt., Ex. 2, Mulcahy Dep., Ex. 3, ECF 77-2 at 204.)[3] Allowing a correctional officer with work restrictions to bid into a division where she could not work certain assignments would cause significant operational issues. (*Id.* ¶ 25.) This would cause the CCSO to reassign officers after the bid concluded to ensure that officers who were able to perform all job duties filled the positions. (*Id.*) This process would also be unfair to officers who were not awarded their bid because the position had been taken by an officer who could not perform all required duties. (*Id.*)

Whether an employee with restrictions can bid into another division depends on whether any positions or assignments within that division can accommodate her restrictions. (*Id.* ¶ 28.) If no positions are available, then she will remain in her current assignment, which can accommodate

---

[1] *See* n.1.
[2] *See* n.1.
[3] *See* n.1.

her restrictions.  (*Id*.) As part of this process, the employer will also consider whether one of the 45 restricted positions in the desired division is open.  (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 27.)  If one of the restricted positions is not open, then the employee is told that she cannot be accommodated in that division and will not be allowed to bid into it.  (*Id*.)

Once a correctional officer is placed into a restricted job position to accommodate her disabilities, she is not required to leave or participate in the bidding process.  (*Id*. ¶ 13.)  The 45 restricted positions cannot be bid into and have never been completely filled.  (*Id*. ¶¶ 13, 14.)  The employer has the exclusive right to permanently or temporarily assign any employee within the same division/unit.  (*Id*.)

### B.    Overtime

The CBA provides that officers "will be afforded the opportunity to work extra hours/shifts . . ." contingent upon the needs of the employer.  (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 31; Def's LR 56.1(a) Stmt., Ex. 2, Mulcahy Dep., Ex. 3, ECF 77-2 at 16.)  Pursuant to the CBA, a correctional officer may work overtime so long as she has not done any of the following in the preceding three months:  (1) used any sick leave when she had no accrued sick leave on the books; (2) been absent no call; or (3) been absent late call without documented justification reasonably acceptable to the employer, including approved FMLA.  (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 15.)  When an officer is deemed ineligible to work overtime because of a CBA violation, she is placed on a "90 Day" list and is not allowed to work voluntary overtime for a ninety (90) day period from the date of her last infraction.  (*Id*. ¶ 16.)  Supervisors of every division/unit receive a copy of the list.

A correctional officer may also be deemed ineligible to work overtime if she is unable to work the position due to any work restrictions, including medical restrictions.  (*Id*. ¶ 18.)  If, however, the position can accommodate her work restrictions, she may work overtime in that position.  (*Id*.)  Having medical restrictions or appearing on a modified duty list or the ADA list should not render an officer ineligible for overtime.  (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 33.)  An officer who has medical restrictions should not be limited to working overtime in one of the 45 ADA/restricted positions and should be able to work overtime in any position so long as it fits the officer's restrictions.  (*Id*. ¶ 34.)[4]  To volunteer for overtime, an officer would add her name, the overtime shift, and her seniority date to an "Overtime Log" in the division in which she seeks to work overtime.  (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 20.)  An officer who places her name on the overtime log is not guaranteed overtime.  (*Id*.)[5]

### C.    Unauthorized absences

The CBA and CCSO policy allow an officer to use benefit time to cover paid absences from work such as medical/sick, vacation, personal, and compensatory time.  (*Id*. ¶ 29.)  An officer

---

[4] *See* n.7.
[5] Plaintiff disputes some of the facts asserted by defendant in this paragraph, but none of those disputed facts are cited here.

can take up to eighty (80) hours of unpaid leave. (*Id*.)[6] Pursuant to the CCDOC's Unauthorized Absence Procedure, an officer who attempts to use benefit time or FMLA but has already exhausted her time for the year will be given an "unauthorized" absence and will be subject to progressive discipline for subsequent violations. (*Id*. ¶ 30.) When an officer calls-in, the call-in personnel do not have access to employee medical files and do not consider whether an officer has a documented disability. (*Id*. ¶ 32.)

***Plaintiff's employment with the CCSO***

Plaintiff began her employment with the CCSO in August of 2003. (*Id*. ¶ 39.) She worked in multiple divisions until the end of 2015. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 1.)[7] From May 6, 2013 through August of 2015, plaintiff served as a tier officer overseeing inmates in various divisions of the Jail. (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 40.) In this role, plaintiff's responsibilities included securing inmates on her tier as well as overseeing and securing the inmates' daily movements and living activities. (*Id*. ¶ 41.)[8] An officer who is assigned to a tier and is prohibited from leaving the tier unattended during her shift must obtain permission from her supervisor before leaving the tier for any reason. (*Id*. ¶ 43.)[9]

In 2015, plaintiff was transferred to a Division known as External Operations, Lot A, which is not a tier position. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 1.)[10] Lot A is a restricted position. (*Id*. ¶ 14.) Plaintiff testified that she believed her assignment in Lot A would be perfect because it was a little guard shack with its own bathroom, and her duties would be limited to checking the I.D.s of employees entering the Cook County employee lot. (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 52.) While working in Lot A, plaintiff had her own bathroom and unfettered access to use the toilet at her discretion. (*Id*. ¶ 51.) In the Summer of 2017, plaintiff complained to Director Reierson about the winter conditions of Lot A. (*Id*. ¶ 58.) In December of 2017, plaintiff was reassigned to Post 9 scan room where she performed pat downs and security screens on individuals entering the Jail. (*Id*.)

### A.    Plaintiff's Crohn's disease

Crohn's disease is an autoimmune disorder and is most commonly characterized by an inflammation and dysfunction of the intestines and bowel, which results in greater urgency to use the restroom, diarrhea, and incontinence among other primary manifestations. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 2.) Plaintiff's Crohn's disease started in 2000 and manifested, in part, as really bad stomach pains, "major . . . constant" diarrhea, and urgency. (*Id*. ¶ 10; Def.'s LR 56(a)(1) Stmt., Ex. 2, Mulcahy Dep., ECF 77-2 at 12.) Plaintiff was first diagnosed with Crohn's disease in 2001. (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 44.) Her Crohn's disease is classified as "moderate to severe" based on her age when the condition presented, the need for surgery, and the need for steroids. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 2.) Plaintiff

---

[6] Paragraph 29 of defendant's LR 56.1(a) Statement says that officers can take up to eighty (80) days of unpaid leave, but the record shows that officers can take up to eight (80) hours of unpaid leave. *See also* n.1.

[7] Defendant disputes some of the facts asserted by plaintiff in this paragraph but none are cited here.

[8] *See* n.1.

[9] *See* n.1.

[10] Defendant disputes some of the facts asserted by plaintiff in this paragraph but none are cited here.

also suffers from depression. (*Id*. ¶ 12.)[11] She is unable to cook, clean, or shower when her depression flares up. (*Id*.)

Dr. David Rubin, plaintiff's treating physician since June of 2011 or 2012, testified that plaintiff has the most common form of Crohn's disease. (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 45.) It causes her to experience "abdominal pain and diarrhea," including "urgency" to use the bathroom and, at times, "incontinence." (*Id*.; Def's LR 56.1(a) Stmt., Ex. 7, Rubin Dep., ECF 77-7 at 12-4.) Plaintiff testified that her Crohn's disease affects her major life activities, including her "capability of using the bathroom, or having control of it." (*Id*. ¶ 46; Def's LR 56.1(a) Stmt., Ex. 2, Mulcahy Dep., ECF 77-2 at 48.)[12]

To treat her Crohn's disease, plaintiff takes various medications, including immunosuppressants. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 10.) Plaintiff also had surgery in May of 2008. (*Id*.) On November 28, 2016, plaintiff saw Dr. Rubin and reported experiencing "three loose stools daily, sometimes watery." (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 47; Def's LR 56.1(a) Stmt., Ex. 7, Rubin Dep., Ex. 2, ECF 77-7 at 34.) On July 3, 2017, plaintiff saw Dr. Rubin and reported experiencing "three loose BMs a day, significant urgency, sometimes only 30 seconds notice." (*Id*.; *Id*. at 37.)

In May of 2008, plaintiff submitted a FMLA request to have intestinal surgery for her Crohn's disease. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 3.) After returning from surgery, plaintiff took FMLA leave on an intermittent basis. (*Id*.) She took a medical leave of absence from May 15, 2008 to around July 8th or 9th 2008 to recover from surgery related to her Crohn's disease. (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 45.)[13] She also took a three-month medical disability leave from May through August of 2015. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 7.)

### B. *Plaintiff's reasonable accommodation request*

Plaintiff testified that she first learned about the availability of ADA proceedings and accommodations when she was on disability leave in 2015. (*Id*. ¶ 8.) That same year, she asked to be reassigned. (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 63.)[14] She testified that she "cannot work in an environment where I'm by myself and I don't have a partner . . . I realized it was so much easier whenever I had partners or core officers, I could just go to the bathroom and not have to worry about having a relief," and she sought reassignment from working as a tier officer in Division 8 and the Pre-release program due to her difficulties in trying to access the restroom when she did not have a partner or back-up officers present. (*Id*.; Def's LR 56.1(a) Stmt., Ex. 2, Mulcahy Dep., ECF 77-2 at 29-30.)

---

[11] *See* n.7.

[12] *See* n.1.

[13] Paragraph 45 of defendant's LR 56.1(a) Statement says that plaintiff took a medical leave of absence from May 15, 2015 to around July 7th or 8th 2015, but a review of the record shows that plaintiff took her medical leave from May 15, 2008 to July 8th or 9th 2008. *See also* n.1.

[14] *See* n.1.

In August of 2015, plaintiff submitted a Reasonable Accommodation Request Form and letter from Dr. Rubin, her treating physician, to defendant. (*Id*. ¶ 49; Def's LR 56(a) Stmt., Ex. 3, Reierson Dep., Ex. 3 and 4, ECF 77-3 at 86-89.) On the form, Dr. Rubin requested that plaintiff be provided with "easy, rapid/fast access to restrooms at all times" and to "avoid any known infectious diseases." (*Id*.; Def's LR 56.1(a) Stmt., Ex. 7, Rubin Dep., Ex. 6, ECF 77-7 at 41.) Dr. Rubin testified that "easy and rapid access" meant "not having to wait to get" to the bathroom, and "going to the bathroom at their discretion when they feel they need to go." (Pl's Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 49.) Dr. Rubin also indicated on the form that plaintiff cannot perform three job functions without an accommodation. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 15; Def's LR 56.1(a) Stmt., Ex. 7, Rubin Dep., Ex. 6, ECF 77-7 at 43.) These job functions are of "medium" importance. (*Id*.) Plaintiff testified that moving inmates in and out of cells for reasons such as medical appointments did not pose a problem because this was always done with a partner. (*Id*. ¶ 26.)

### C.     2016 Compound-wide bid

Prior to the September 2016 compound-wide bid, plaintiff and other employees with work restrictions received the following message, in part:

> This letter is to inform you that you are eligible to participate in the upcoming compound wide bid September 12 to September 15, 2016.
>
> Please note that your bid will only be accepted if you are able to perform the essential job functions of the position, with or without reasonable accommodation. If you are only able to work certain posts, we will have to assess your bid prior (sic) your bid date by determining whether you can be reasonably accommodated in the Division and Detail for which you are bidding. Therefore you must send your request via email with your bid request no later than Wednesday, September 7, 2016.

(Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 26; Def's LR 56.1(a) Stmt., Ex. 5, Miller Dep., Ex. 7, ECF 77-5 at 83.)[15] (emphasis omitted). Before the 2016 bid, plaintiff submitted a request to Director Reierson to bid into Division VI. (*Id*. ¶ 72.) CCDOC operations determined that plaintiff could not bid into that division, and plaintiff was unable to bid into other divisions because no assignments were available that could accommodate her work restrictions. (*Id*.)[16]

Michael Miller, who is an Assistant Executive Director with the CCSO and oversees operations within the CCDOC and the Jail, testified that the ability to work with inmates is an essential job function for any correctional officer. (*Id*. ¶¶ 3, 42.) Director Miller further testified about the importance of correctional officers staying at their assigned post throughout their shift, stating "at any given time you're dependent upon being on that assignment, or whether it would be backup, whether it would be to perform duties or in an emergency situation," and "you have to be on that tier to respond to and control that emergency, and if you can't be there then it's—that

---

[15] *See* n.1.
[16] *See* n.1.

could mean life and death." (*Id.* ¶ 62; Def's LR 56.1(a)Stmt., Ex. 5, Miller Dep., ECF 77-5 at 64-65.)[17]

The Reasonable Accommodation Request Form completed by plaintiff includes a list of essential job functions, such as "monitoring activities of inmates, including watching closely for behavioral issues[;] conducting head counts[;] diffusing disruptive behavior verbally and, if escalated, physically[;] searching perimeters of assigned areas on foot; conducting security checks of locks, doors, bars, and windows[;] and, transporting inmates outside of the facility." (*Id.* ¶ 42; Def's LF 56.1(a) Stmt., Ex. 7, Rubin Dep., Ex. 6, ECF 77-7 at 43.)[18] The Form also stated that plaintiff could not perform certain essential job functions due to her Crohn's, including "searches perimeter on foot[;] conducts security checks of locks, doors, bars and windows[;] prepares inmates for transportation through search and application of restraining devices[;] and, transports inmates outside of the facility to and from court, lawyer's visits, medical appointments, work sites or other facilities as required." (*Id.*)[19] Plaintiff testified that she could have worked in positions other than Lot A and Division VI and still have her restrictions met. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 36.)

Don Beachem currently serves as the Superintendent of Division VI. (*Id.* ¶ 16.) He previously served as a Lieutenant in Division IX until July 2016. (*Id.*) He was subsequently promoted to Superintendent of Division IX and then became the Superintendent of Division VI in August of 2016. (*Id.*) Supt. Beachem testified that all positions within Division VI are readily accessible to the washroom, and Division VI does not have any disease treatment units. (*Id.* ¶ 17.) Supt. Beachem further testified that Division IX has five officers per tier, which means officers can go to the bathroom "as much as they [please]." (*Id.* ¶ 18; Pl's Stmt. Add'l Facts, Ex. 1, Beachem Dep., ECF 80-1 at 34.) Supt. Beachem described the procedures for using the bathroom: an officer radios and requests a "44" from her supervisor, the supervisor indicates that she has received the request, the supervisor clears the officer to go, and then cameras on both tiers are monitored more closely. (*Id.* ¶ 19.) During this process, an officer's partner does not need to leave her tier to come to the tier of a "44" officer. (*Id.*) Supt. Beachem testified that a bathroom break is typically fifteen minutes. (*Id.* ¶ 22.)[20] Additionally, Supt. Beachem testified that he does not know of a situation, at least in Divisions VI or IX, where an officer requesting to use the bathroom was not given permission to do so. (*Id.* ¶ 20.) He further testified that he was not aware of any officer who, if told that she could not get back up after calling in, would sit and wait to go to the bathroom. (*Id.* ¶ 21.) According to Beachem, "[t]hey're going to go and they'll deal with it later." (*Id.*; Pl's Stmt. Add'l Facts, Ex. 1, Beachem Dep., ECF 80-1 at 29-30.)

Plaintiff testified that, prior to the 2016 bid, she described her restrictions to Supt. Beachem and asked whether she would be able to bid into Division VI. (*Id.* ¶ 25.) Supt. Beachem indicated that he would be able to take care of plaintiff and would put her in a decent spot next to the bathroom. (*Id.*) In 2017, Supt. Beachem spoke with plaintiff and suggested that she try to come

---

[17] *See* n.1.

[18] Plaintiff contends that the issue of "essential job functions" is disputed and cites to the 45 restricted positions created by the CCSO.

[19] Plaintiff contends that the issue of "essential job functions" is disputed and cites to the 45 restricted positions created by the CCSO.

[20] *See* n.7.

to Division VI.[21]  Supt. Beachem stated that, based on his knowledge of plaintiff, there would be no reason why she would not be able to work in Division VI.  (*Id.* ¶ 24.)

### D.     Overtime

Plaintiff testified that in the Fall of 2015, she learned that she was being denied the opportunity to work overtime.  (*Id.* ¶ 28; Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 64.)  She placed her name on the Overtime Log sign-up sheet in the External Operations unit, but she was not awarded any shifts over the next eleven months.  (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 64.)  Plaintiff further testified that her supervising lieutenant informed her in May or June of 2016 that she needed to work the Lot A post because of her restrictions and that Lot A did not have any overtime shifts available because the next shift was not active.  (*Id.* ¶ 65.)[22]  According to plaintiff, she started putting her name on the overtime list, but her Lieutenant told her that she's not allowed to work overtime if she is TWA.[23]  (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 28.)[24]  And, a couple of months later, the same Lieutenant told plaintiff that she was not able to work overtime because she was ADA.  (*Id.*)[25]  Plaintiff says that she tried to put her name on the list as much as she could, but her Lieutenant eventually told her not to bother anymore.  (*Id.* ¶ 29.)[26]  The External Operations Overtime Logs show that plaintiff placed her name on the list approximately four times between October 1, 2015 and September 21, 2016.  (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 69.)  Plaintiff's name was on the overtime list sixteen times between September 22, 2016 and January 1, 2017.  (*Id.* ¶ 70.)[27]  Plaintiff testified that there was a "plethora of overtime" and that "anybody who wanted overtime, got it" during the time in which she was being denied overtime.  (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 30; Def's LR 56.1(a) Stmt., Ex. 2, Mulcahy Dep., Ex. 2, ECF 77-2 at 53-54.)  Plaintiff testified that she did not have any issues with being denied overtime after September or October of 2016 to September of 2018.  (*Id.* ¶ 67.)[28]

Plaintiff had multiple communications with Director Reierson about her concerns that she was not being permitted to work overtime.  (*Id.* ¶ 35.)  In September and October of 2016, plaintiff emailed Director Reierson and complained that she was being prevented from working overtime.  (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 66.)  Director Reierson then emailed plaintiff's supervisors to confirm that plaintiff could work overtime if she worked an assignment within her restrictions.  (*Id.*)  Director Miller testified that he was not aware that plaintiff was not allowed to work overtime for any period of time except for when she appeared on the 90-day dock list that he had been presented with during his deposition.  (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 32.)

---

[21] *See* n.7.
[22] *See* n.1.
[23] Plaintiff described TWA as "transit and transitional work assignments" and testified that "everyone knows that, TWA you're not allowed to work overtime or bid.  You're not allowed to bid in the compound bid either."  (Def's LR 56.1(a) Stmt., Ex. 2, Mulcahy Dep., Ex. 2, ECF 77-2 at 54.)
[24] Defendant objects to this allegation as inadmissible hearsay.
[25] Defendant objects to this allegation as inadmissible hearsay.
[26] Defendant objects to this statement as inadmissible hearsay.
[27] *See* n.1.
[28] *See* n.1.

### E. Unauthorized absences

Plaintiff testified that she had to serve three suspension days between December 2014 and May 2015 for absences related to her medical condition. (Def.'s Resp. Pl's Stmt. Add'l Facts, ECF 89 ¶ 38.) The absences were deemed unauthorized because plaintiff had exhausted her FMLA time. (*Id.*) While the discipline for these absences was overturned by an arbitrator, the pay for the suspension days was not rectified. (*Id.*) Plaintiff did not incur any discipline for unauthorized absences beginning in mid-April of 2015 to March 8, 2018. (Pl.'s Resp. Def's LR 56.1(a) Stmt., ECF 80 ¶ 75.)

## STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). It is well settled that at the summary judgment stage, the court does not make credibility determinations, weigh evidence, or decide which inferences to draw from the facts; those are jury functions. *See Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014).

## ANALYSIS

Plaintiff has filed a three-count complaint against defendant, alleging that defendant (1) failed to accommodate her disability; (2) discriminated against her based on her disability due to disparate treatment; and (3) retaliation. As to Count I, plaintiff says that defendant failed to accommodate her condition by not providing her with the ability to quickly access a restroom during her shift, the ability to leave her work post on short notice, being stationed away from infectious disease outbreaks or quarantine areas, and additional medical leave as needed for her condition beyond the standard FMLA allotment without penalty. For Count II, plaintiff says defendant discriminated against her on the basis of her disability by preventing her from working overtime and participating in the compound-wide "bid" process which would allow plaintiff to change work assignments, and for penalizing her for needing medical leave beyond the amount allowed under FMLA. As to Count III, plaintiff alleges that defendant retaliated against her for requesting a reasonable accommodation by preventing her from obtaining overtime or participating in the bid process. Plaintiff further says that defendant penalized her for needing additional medical leave beyond that allowed under FMLA.

Defendant moves for summary judgment, arguing that plaintiff has failed to exhaust her administrative remedies, she is not a qualified individual under the ADA, her needs were

reasonably accommodated, she was not subject to any materially adverse employment action due to her disability, and she cannot show that defendant retaliated against her for engaging in protected activity. The Court will address each argument in turn.

## I.      Whether plaintiff failed to exhaust her administrative remedies and is therefore barred from pursuing certain claims.

Defendant first argues that, because plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 2, 2016, she cannot pursue any claims against defendant that are based on actions occurring more than 300 days prior. That is, plaintiff cannot pursue any claims that occurred before February 2, 2016.

In Illinois, an employee who alleges disability discrimination must file a charge with the EEOC within 300 days of the alleged unlawful act. 42 U.S.C. § 2000e-5(e)(1); *see also Duignan v. City of Chi.*, 275 F. Supp. 3d 933, 937 (N.D. Ill. Apr. 6, 2017). This requirement allows the EEOC to decide whether to file charges and encourages the employer and employee to resolve the dispute informally. *Doe v. Oberweis Dairy*, 456 F.3d 704, 708 (7th Cir. 2006). The Supreme Court has held that "[a] party . . . must file a charge within either 180 or 300 days of the date of the [discriminatory] act or lose the ability to recover for it." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). A discriminatory practice is defined as "a discrete act or singular 'occurrence,' even when it has a connection to other acts." *Id.* at 111. "Time starts to run 'with the *discriminatory act*, not the point at which the *consequences* of the act become painful.'" *Lever v. Nw. Univ.*, 979 F.2d 552, 553 (7th Cir. 1992) (quoting *Chardon v. Fernandez*, 454 U.S. 6 (1981)) (emphasis in original). When "a single discriminatory decision is taken, communicated, and later enforced despite pleas to relent – the time starts with the initial decision." *Id.* at 556 (citing *Webb v. Indiana Nat'l Bank*, 931 F.2d 434, 437 (7th Cir. 1991)) (differentiating between ad hoc, unrelated instances of discrimination and a situation where an employee files a charge with the EEOC after rejection from a second job with the same employer). The period to file an EEOC charge alleging discriminatory employer conduct starts when action occurs. *Id.*

### A.      Failure to Accommodate

Defendant contends that plaintiff's failure to accommodate claims are barred because she filed her first request for failure to accommodate in August of 2015, which is beyond the 300-day timeframe. Plaintiff responds that she is not challenging her 2015 accommodation request and subsequent assignment to Lot A, (*see* dkt. 79 at n.2), but, rather, she is challenging her September 2016 request to bid into different job positions, particularly Division VI, and the subsequent denial of that request. Defendant does not address plaintiff's challenge to her September 2016 request in its reply.

A review of the evidence shows that that plaintiff's request to bid into different job positions is an identifiable act that differentiates in substance from plaintiff's August 2015 request. The September 2016 request is also within the 300-day timeframe. Given this, the Court finds this claim to be timely. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113 ("Each discrete discriminatory act starts a new clock for filing charges alleging that act.").

### B. Overtime Pay

Defendant next contends that plaintiff's overtime claims are barred because she allegedly learned in 2015 that she was denied the opportunity to work overtime and she has failed to present any evidence showing that the alleged denial of overtime after February 6, 2016 was a separate, discrete act. In making this argument, defendant cites *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007) for the proposition that the EEOC charging period occurs when a discrete unlawful practice occurs. 550 U.S. at 2169.

Plaintiff responds that her overtime claims are not barred because, for each paycheck she was denied overtime, a new act of discrimination occurred. In support, plaintiff invokes the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), which provides that an "unlawful employment practice" occurs "when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 42 U.S.C. § 2000e5(e)(3)(A).

The Supreme Court held in *Ledbetter* that an aggrieved employee could not establish Title VII liability if the discriminatory decision predated the limitations period. *Ledbetter*, 550 U.S. at 643. However, the Fair Pay Act overturned this ruling and reinstated the paycheck accrual rule under Title VII. The Act clarified that "an unlawful employment practice occurs for purposes of the statute of limitations 'each time . . . compensation is paid, resulting in whole or in part from [an unlawful employment] decision or other practice.'" *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 888 (7th Cir. 2012). Effectively, the Act extends the statute of limitations every time a paycheck is issued. *Id.* "[A]n unlawful employment practice occurs, with respect to discrimination in compensation . . . , when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." *Brown v. N. Ill. Univ.*, 274 F. Supp. 3d 807, 813 (N.D. Ill. 2017) (quoting 42 U.S.C. § 2000e-5(e)(3)(A)).

Here, plaintiff claims that defendant denied her the opportunity to work overtime from October of 2015 to September of 2016 in retaliation for plaintiff needing and requesting reasonable accommodation and/or because plaintiff is a qualified individual with a disability under the ADA. She says these repeated denials affected her paycheck. In other words, plaintiff says that each denial of overtime was an unlawful compensation decision, and these denials continued through September 2016, which falls within the limitations period. Because some of plaintiff's affected paychecks fall within the limitations period, the Court finds these claims to be timely. *See Brown*, 274 F. Supp. 3d at 813 (former employee's claim of a discriminatory compensation decision was timely because he was "affected" each time he was paid, up to and including his final paycheck); *see also Groesch v. City of Springfield*, 635 F.3d 1020, 1026 (7th Cir. 2011) (holding that each paycheck reflecting unlawful discrimination creates a new cause of action under 42 U.S.C. 1983, similar to Title VII under the Ledbetter Act).

### C. Three-Day Suspension

Plaintiff also takes issue with the three-day suspension she served between December of 2014 and May of 2015 for absences related to her medical condition. She says that an arbitrator overturned the discipline but did not rectify her compensation. According to plaintiff, these missed days continue to affect her compensation and pension contribution with every paycheck and pay period. In response, defendant contends that plaintiff cannot pursue this claim, which occurred in 2014 and 2015, because she did not timely exhaust her administrative remedies. For the same reasons the Court found plaintiff's overtime claims to be timely, the Court finds this claim to be timely.

## II. Whether plaintiff is a qualified individual with a disability under the ADA

Defendant next argues that plaintiff has not shown that she is a qualified individual with a disability. According to defendant, plaintiff cannot show that her Crohn's disease substantially limits a major life activity. Additionally, defendant contends that plaintiff cannot perform the essential functions of her job with or without a reasonable accommodation.

To establish a violation under the ADA, a plaintiff must show that (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation. *Winsley v. Cook County*, 563 F.3d 598, 603 (7th Cir. 2009) (internal quotations and citations omitted). The ADA prohibits certain employers from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination in this context includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer]." 42 U.S.C. § 12112(b)(5)A).

### A. Disability under the ADA

Defendant first argues that plaintiff does not have a qualifying disability under the ADA. Under the Act, a disability is defined as "a physical… impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). To establish that an impairment is a disability under the Act, plaintiff must show that it "substantially limits [her ability] to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii); *see also* 42 U.S.C. § 12102(1)(A). Not every impairment, however, is considered a disability. *Id*. A major life activity includes, "the operation of a major bodily function, including but not limited to, functions of the immune system, . . . digestive, [and] bowel, . . . functions. 42 U.S.C. § 12102(2)(B); *see also* C.F.R. § 1630.2(i)(1)(ii).

12

The parties agree that Crohn's disease inhibits digestive and bowel function and that both functions are considered "major bodily functions" under the ADA. But the parties disagree as to whether these major life activities (digestive and bowel function) are substantially limited by plaintiff's Crohn's disease. The term "substantially limits" should not be considered an onerous or high bar for a plaintiff to meet.[29] 42 U.S.C. § 12102(4)(B) ("The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008."). When enacting the ADA Amendments Act of 2008 ("ADAAA"), Congress sought to ensure that the scope of the Act was broad and inclusive and sought to undo the U.S. Supreme Court's rulings that defined "disability" narrowly and established a high bar for a plaintiff to meet. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Courts should construe the term "substantially limits" "broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA . . . [the term] is not mean to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

It is undisputed that plaintiff has Crohn's disease and has up to three urgent bowel movements each day. Plaintiff says she is a qualified individual with a disability because her Crohn's disease is "moderate to severe" due to her age and her need for surgery and steroids. She also highlights the debilitating effects of the disease, such as the immune side-effects of treatment, co-morbid depression, and the various ways in which it has impacted her life and substantially limited her major life activities. According to plaintiff, medication and surgery have helped, but she still has flare-ups.

Defendant counters that plaintiff has not submitted sufficient evidence to show that her Crohn's disease "substantially limits" her disposal of waste and use of the bathroom. In support of this argument, defendant relies on several cases where courts granted summary judgment in favor of the defendant after finding that the evidence did not support the plaintiff's contention that his or her Crohn's disease was considered a qualifying disability because it did not substantially limit his or her daily life activity. However, these cases involve scenarios that occurred prior to the amendment of the ADA in 2008. *See Smith v. Levy Sec. Corp.*, No. 09 C 7472, 2012 WL 1655955, at *5 (N.D. Ill. May 10, 2012) (applying pre-amendment version of the ADA to evaluate plaintiff's Crohn's disease); *Gratzl v. Chief Judges of the 12th, 18th, 19th & 22nd Judicial Dist.*, No. 07 C 0867, 2008 WL 2840566, at *4 (N.D. Ill. July 22, 2008) (same); *Banks v. CBOCS W., Inc.*, No. 01 C 795, 2005 WL 1126913, at *4 (N.D. Ill. May 9, 2005) (same); *Block v. Ill. Sec'y of State*, No. 09-117-DRH, 2010 WL 5178032, at *4 (S.D. Ill. Dec. 15, 2010) (same). As noted, courts should construe the term "substantially limits" "broadly in favor of expansive coverage." 29 C.F.R. § 1630.2(j)(1)(i). And, the application of the ADAAA is not retroactive. *Johnson*, 142 F. Supp. 3d at 684.

As for the evidence, defendant says that plaintiff's condition, described as no more than three bowel movements per day, is no different than the bathroom usage of a typical correctional officer who uses the bathroom three times a shift. That is, plaintiff's Crohn's disease does not substantially limit any of her daily life activity because it is no more limiting than that of the

---

[29] The ADA was amended in 2008 and became effective on January 1, 2009. *Johnson v. City of Chi. Bd. of Educ.*, 142 F. Supp. 3d 675, 684 (N.D. Ill. Nov. 2, 2015). "Congress did not express its intent that the amendments be retroactive . . ., and the Seventh Circuit has found that they are not." *Id.* (citing *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, n.1 (7th Cir. 2009)).

general population.  Defendant also characterizes plaintiff's testimony that she has an "urgent" need to use the bathroom or experiences diarrhea, abdominal pains, and incontinence as vague. Further, defendant discounts Dr. Rubin's testimony that plaintiff's Crohn's disease is "moderate to severe."  Defendant also discounts plaintiff's assertion that she has "co-morbid" depression due to her Crohn's disease.  Based on this, defendant contends that plaintiff's Crohn's disease is not "substantially limiting" and does not qualify as a disability under the ADA.

A review of the evidence shows that plaintiff's Crohn's disease causes her to use the bathroom three times per day.  Plaintiff testified that her Crohn's disease is moderate to severe in nature, she has had surgery, and she needs to take medication to treat her disease.  Plaintiff also testified that her Crohn's affects her major life activity of using the bathroom or having control over when she needs to use bathroom.  She further testified that she suffers from depression, but the record is unclear as to whether the depression is related to her Crohn's disease.  Plaintiff also submits evidence from her treating physician, Dr. Rubin, who testified that plaintiff's Crohn's causes her abdominal pain, diarrhea, an urgency to use the bathroom, and occasional incontinence.

When drawing all reasonable inferences in plaintiff's favor, as the Court is required at this stage of the proceedings, the Court finds that there is a genuine issue of material of fact as to whether plaintiff plaintiff's Crohn's disease substantially limits her in the major life activities that she identifies such that she is a qualified individual with a disability.  Given that the standard for the term "substantially limits" is not intended to be a demanding standard and that plaintiff has presented some evidence to support her contention that her Crohn's disease should be considered a disability under the ADA, plaintiff's motion for summary judgment as to this argument is denied.

### B.    Ability to perform essential job functions

Defendant next argues that plaintiff has presented insufficient evidence to show that she can perform the essential functions of her job with or without reasonable accommodation.  Under the ADA, a "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  The Seventh Circuit applies a two-part test when determining whether a plaintiff is a "qualified individual."  *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015).  First, the court considers whether the plaintiff satisfies the prerequisites for the position, including, among other things, education, employment experience, skills, and licenses.  *Id*.  The court next considers whether the plaintiff can perform all essential elements of the job with or without reasonable accommodation.  *Id*.  The court will then look at a variety of factors to determine what duties count as essential to determine part two of the test.  *Id*.

To determine which duties and functions are essential to a job, a court may consider various factors, including the employer's judgment, the job description, the amount of time spent on the task, and the consequences of the task not being performed.  *Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015).  Evidence of the employer's actual practices in the workplace may also be considered. *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 570 (7th Cir. 2019) (citing *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 199-200 (7th Cir. 2011)).  The statue gives "consideration . . . to the employer's judgment as to what functions of a job are essential."  *Id*.  An employee who is unable

to perform the essential duties of her job cannot recover under the ADA. *Bilinsky*, 928 F.3d at 569. This is so even if the employee's inability to perform these tasks is due entirely to her disability. *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008) (internal quotations and citations omitted). "[A]lthough "the employer's judgment is an important factor, . . . it is not controlling."" *Bilinsky*, 928 F.3d at 570 (quoting *Miller*, 643 F.3d at 198)). "The ADA does not give employers unfettered discretion to decide what is reasonable." *Id*.

"[T]he ADA may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Stern*, 788 F.3d 276, 291 (7th Cir. 2015) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996)). While an employer may have an obligation to reassign a disabled employee, the employer need only reassign the disabled employee to vacant positions. *Id.*; *see also* 42 U.S.C. § 12111(9)(B) (the term "reasonable accommodation" may include "reassignment to a vacant position.")

The plaintiff bears the initial burden of demonstrating that she is a "qualified individual who could perform the essential functions of her position." *Id.* (quoting *Taylor-Navotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014). Determining whether an employee can perform the essential functions of her job is a question of fact, not a question of law. *Id.* Here, Defendant does not question plaintiff's ability to satisfy the prerequisites of becoming a correctional officer. Defendant does, however, challenge plaintiff's ability to perform the essential functions of her job.

Plaintiff was a hired as a correctional officer and served many years as a tier officer before taking medical leave in 2015. Plaintiff says that she can perform her essential job functions with or without a reasonable accommodation. In support, she points to the 45 positions identified by defendant to accommodate officers who have ADA or other medical restrictions and points out that she was placed into one of those positions. Additionally, plaintiff says that she could have filled a tier position with reasonable accommodation and that the only job duty that she could not perform is classified as "medium" importance to the Sheriff. She says her condition causes her to use the bathroom about three times each day and that her only restrictions are ready access to a bathroom and avoidance of virulent disease outbreaks. Should plaintiff have a flare-up, she says she could use FMLA. Plaintiff further says that a correctional officer's use of the restroom three times during a shift is not excessive and would pose no problem to jail operations as some positions have multiple officers on a single tier, such as Division IX. She says other tiers, such as Division VI, only have one officer per tier, but officers have partners and can radio a supervisor when in need of a bathroom. Finally, plaintiff points to the testimony of Superintendent Don Beachem who testified that he was not aware of any reason why plaintiff would not be able to work in Division VI and that he had spoken with plaintiff in advance of the 2016 bid and told her that he would be able to take care of her and place her in a position near the restroom.

Defendant responds that there is insufficient evidence to show that plaintiff can perform the essential functions of the position that she holds or desires with or without a reasonable accommodation. According to defendant, a correctional officer's primary function involves directly overseeing inmates and maintaining security posts to preserve security and respond to emergencies. Protocol requires that, before a correctional officer can use the restroom, an officer

must radio in a request, wait for approval from a supervisor, and wait to be relieved by another officer on the tier. Correctional officers do not always have partners, and plaintiff's frequent trips to the bathroom could pose a security risk. Defendant says that, after plaintiff returned from medical leave in 2015, she insisted that her condition required her to have immediate access to the bathroom without any discretion or approval from supervisors. Defendant says it reasonably determined that plaintiff could not serve as a tier officer because she could not perform the essential functions of her job. That is, she could not perform the essential functions of her job because she cannot stay at her post at all times and supervise inmates, which disrupts protocol and creates certain security risks.

After reviewing the evidence, the Court finds that plaintiff has put forth sufficient evidence to show that a genuine issue of material fact exists as to whether she can perform the essential functions of the job she holds or desires and whether she can be reasonably accommodated in those positions. To start, plaintiff has been permanently working in one of the 45 restricted positions since she began working in Lot A in 2015. According to the testimony of Director Miller, he is not aware of these positions becoming full. *See* 42 U.S.C. § 12111(9)(B) (the term "reasonable accommodation" may include "reassignment to a vacant position.") There is no evidence to suggest that plaintiff cannot perform her job duties in Lot A. Likewise, defendant does not argue that plaintiff cannot perform her job duties in Lot A.

As for the tier assignments, "a court may consider various factors, including the employer's judgment, the job description, the amount of time spent on the task, and the consequences of the task not being performed. *Shell*, 789 F.3d at 717. Plaintiff's treating physician noted that plaintiff is unable to perform three essential functions that the CCSO considers to be of "medium" importance. Director Miller testified that the ability to work with inmates is an essential job function for any correctional officer. He further testified about the importance of a correctional officer remaining at her assigned post through her shift, citing security concerns that could arise in an emergency.

The notion of directly overseeing inmates throughout a shift appears to be a fluid concept. Plaintiff appears to have the ability to work with inmates, except for the moments when she needs to use the bathroom or has an urgent need to use the bathroom. Correctional officers are allowed to use the restroom throughout their shift, typically three times per shift in fifteen-minute intervals, which means that officers move throughout their shift. Supt. Beachem testified that, based on his experience, he sees no reason as to why plaintiff could not serve as a tier officer in Division VI or XI. The Court recognizes that plaintiff's situation is different than that of the average officer due to her Crohn's disease and her urgent need to use the restroom. The Court also recognizes the unique circumstances of working in a correctional facility and the need to obtain prior approval before leaving one's assignment to use the restroom. Whether plaintiff could work the essential functions of her job with a reasonable accommodation, such as placing her on a tier with a group of officers (Division IX) or placing her in a position near the bathroom (Division VI) is a question of fact left to be resolved by a jury.

After considering the evidence presented by plaintiff, the Court finds that a disputed issue of fact exists as to whether plaintiff is able to perform the essential functions of her job with or

without a reasonable accommodation.  Accordingly, defendant's motion for summary judgment as to this argument is denied.

## III.   Failure to Accommodate

To survive her failure-to-accommodate claim, plaintiff must present evidence showing that (1) she is a qualified individual with a disability; (2) defendant was aware of the disability; and, (3) defendant failed to reasonably accommodate that disability.  *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014).  As to the first element, the Court has concluded that plaintiff has presented sufficient evidence to show that she is a qualified individual with a disability.  The parties do not dispute the second element.  As to the third element, reasonable accommodations include, "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[.]"  29 C.F.R. § 1630.2(o)(1)(ii).  Further considerations include, "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."  29 C.F.R. § 1630.2(o)(1)(iii).  "Once an employee requests a reasonable accommodation, the employer must meet the employee halfway and engage in a 'flexible, interactive process' to identify the necessary accommodations."  *Reeves*, 759 F.3d at 701 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013)).  Both parties are required to engage in that process.  *Brown v. Milwaukee Bd. of Sch. Dir.*, 855 F.3d 818, 821 (7th Cir. 2017).  "If a reasonable accommodation was available but the employer prevented its identification by failing to engage in the interactive process, that failure is actionable."  *Id*.  However, if the employee fails to provide sufficient information to her employer to evaluate the necessary accommodations, the employer cannot be held liable.  *Reeves*, 759 F.3d at 702 (citing *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1120, 1135 (7th Cir. 1996)).

### A.      2016 compound-wide bid

Plaintiff complains that defendant failed to accommodate her during the 2016 bidding period.  She says she bid into Division VI but learned from Human Resources that she was not selected for the position because she could not be accommodated there.  Plaintiff complains that her rights were violated because defendant (1) denied plaintiff her right to bid into a job position as contemplated by her CBA, and (2) failed to engage in an interactive process with her (or attempt to conduct an individualized inquiry) to determine whether plaintiff's specific restrictions could be accommodated in a particular job position.

Defendant first argues that there is no evidence showing that defendant deprived plaintiff of her right under the CBA to bid into a different position because the CBA provides that correctional officers with "duty-injury or disability" are not allowed to participate in the formal compound-wide bid.  And, defendant says that it not only considers plaintiff's needs when assigning job positions during the bidding process, it also considers the needs of other correctional offers and the CCSO.  Defendant further argues that the evidence shows that it did act reasonably to accommodate plaintiff by placing her in Lot A in 2015 and then at Post 9 in 2017.

As to plaintiff's claim that defendant failed to engage in the interactive process with her, defendant again says that plaintiff has submitted insufficient evidence to show that defendant failed to engage in this process. Defendant points to evidence showing that Human Resources contacted plaintiff prior to the 2016 bid and invited her to submit her desired bid. Human Resources reviewed plaintiff's request to bid into Division VI along with her stated work restrictions, conferred with both CCSO operations and plaintiff on several occasions, and ultimately determined that no positions in Division VI were available that met plaintiff's restrictions. Defendant also argues that plaintiff has submitted insufficient evidence to show that any positions in Division VI that met plaintiff's restrictions were available. Further, defendant contends that the ADA only requires defendant to provide her an assignment that allowed her to work in reasonable comfort; the ADA does not require defendant to place plaintiff in her preferred assignment. Finally, defendant challenges the sufficiency of Supt. Beachem's testimony, arguing that Supt. Beachem did not know if any positions were available in Division VI that could accommodate plaintiff, and plaintiff did not know anything about plaintiff's medical condition or work restrictions and did not have knowledge of or responsibility for the bidding process and placement of officers into accommodated assignments.

Here, the evidence shows that the CBA does not allow officers to participate in the formal compound-wide bid process if they have certain designations, including disability. The CCSO has a written policy and practice to help employees obtain job accommodations related to a disability or medical condition. An employee with restrictions may bid into another division so long as another position or assignment within that division can accommodate her restrictions. If no positions are available, then she will remain in her current assignment. Because the CBA, by its own terms, prohibits plaintiff from participating in the formal compound-wide bid, the Court finds that no reasonable juror could conclude that defendant deprived plaintiff of her right under the CBA to bid into a different position.

As for plaintiff's claims that defendant failed to engage in an interactive process with her, the evidence shows that defendant did consult with plaintiff prior to the 2016 compound-wide bid. Plaintiff received a letter in advance of the bid, advising plaintiff that she was eligible to participate in the bid and that her bid would only be accepted if she could perform the essential functions of the position with or without reasonable accommodation. Plaintiff then contacted Director Reierson and requested to bid into Division VI, and CCDOC operations determined that plaintiff could not bid into Division VI or other divisions because no available assignments could accommodate her work restrictions. Plaintiff contends that she should not be limited to being placed in one of the 45 restricted positions and defendant should have conducted a more thorough individualized assessment about whether her specific restrictions could be accommodated within a particular position. Although plaintiff may have preferred a position other than the available restricted positions, "[a]n employer satisfies its duty to reasonably accommodate an employee with a disability when the employer does what is necessary to allow the employee to work in reasonable comfort." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012). Likewise, defendant only needed to provide plaintiff with "'a reasonable accommodation, not the accommodation [she] would prefer. *Id.* (quoting *Rehling v. City of Chi.*, 207 F.3d 1009, 1014 (7th Cir. 2000)). In light of the fact that defendant contacted plaintiff in advance of the 2016 bid, spoke with her and evaluated her bid, and allowed her to stay in her restricted position, the Court finds that no

18

reasonable jury could conclude that defendant failed to reasonably accommodate plaintiff's requests. Accordingly, defendant's motion for summary judgment is granted as to this claim.

## IV. Disparate treatment

"To prevail on a disparate treatment claim, a plaintiff must show [she] is a qualified individual with a disability who could perform the essential functions of the job with or without a reasonable accommodation, and [she] suffered an adverse employment action because of [her] disability." *Girten v. Town of Schererville*, 819 F. Supp. 2d 786, 797 (May 2, 2011). Plaintiff contends that she was subjected to disparate treatment because (1) defendant deprived her of her right under the CBA to bid into different positions, (2) she had a disability, and (3) defendant did not want to properly accommodate her in her desired position. Plaintiff also alleges that she was denied the opportunity to work overtime after she returned from disability leave in August of 2015, and after she had submitted a request for a reasonable accommodation.

Defendant responds that plaintiff did not suffer an adverse employment action because of her disability. Defendant further says that plaintiff has presented insufficient evidence to show that she was denied the opportunity to work overtime or bid because of her disability or that defendant's conduct constituted intentional discrimination.

### A.   Adverse employment action

### i.   Overtime and 2016 compound-wide bid

Defendant argues that plaintiff did not suffer an adverse employment action due to her disability and says plaintiff has failed to meet her burden. In support, defendant contends that plaintiff has failed to put forth any evidence to show that overtime was a significant, recurring part of her total earnings. Defendant points out that plaintiff had only placed her name on the overtime list four times between October of 2015 and September of 2016. And all four of these instances occurred in August of 2016. Defendant relies on *Lewis v. City of Chi.*, 496 F.3d 645 (7th Cir. 2007) for the proposition that the denial of overtime will be considered an adverse action if it constitutes a significant portion of an employee's salary but will not if it is "sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer." *Id.* at 653 (overtime can be similar to a recurring raise in that it constitutes a significant and recurring part of an employee's total earnings, or overtime can be similar to a discretionary bonus that is insignificant and nonrecurring). Likewise, defendant argues that plaintiff has failed to show that defendant's alleged denial of her ability to participate in the 2016 compound-wide bid constituted a materially adverse action because it did not affect her compensation, benefits, job title, opportunity for future pay, or working conditions.

Adverse actions include,

(1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and

19

experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004).

Here, plaintiff says that she had been able to work overtime prior to her medical leave in 2015. She testified that, when she returned from her medical leave, she placed her name on the Overtime Log sign-up sheets in the External Operations unit but was not awarded any overtime shifts over the next eleven months. The External Operations Overtime Logs show that plaintiff placed her name on the list approximately four times between October 1, 2015 and September 21, 2016. Plaintiff also placed her name on the overtime list sixteen times between September 22, 2016 and January 1, 2017. Plaintiff also testified that, during the time in which she was denied overtime, there was a "plethora of overtime" and that "anybody who wanted overtime, got it." (Def's LR 56.1(a) Stmt., Ex. 2, Mulcahy Dep., Ex. 2, ECF 77-2 at 53-54.) Moreover, Director Reierson confirmed that plaintiff could work overtime if she worked an assignment within her restrictions.

Considering these facts in the light most favorable to plaintiff, a reasonable jury could conclude that overtime shifts at the Jail were consistent and could constitute a significant portion of plaintiff's compensation. Plaintiff says that she had worked overtime in the past and had repeatedly attempted to work overtime after she had returned from medical leave but was not given the opportunity to do so. Given this, the Court finds that plaintiff has presented sufficient evidence to show that a genuine issue of material fact exists as to whether she experienced an adverse employment action as it relates to the alleged denial of overtime from October 2015 to September 2016. (*See* Pl's Resp., ECF 79 at 12.)

As for her alleged inability to bid into a different position, plaintiff has not shown that this affected her compensation, nor has she shown that it affected any of the other factors listed above.

For these reasons, the Court finds that plaintiff has put forth sufficient evidence showing that she suffered an adverse employment action related to the alleged denial of overtime. However, plaintiff has not shown that she suffered an adverse employment action as it relates to the alleged denial of her ability to participate in the 2016 compound-wide bid.

### B.    Discrimination on the basis of disability

#### i.    Overtime

Plaintiff next contends that defendant denied her overtime on the basis of her disability. According to plaintiff, her supervising lieutenant told her that she needed to work the Lot A post due to her restrictions, and Lot A did not have any overtime shifts because the next shift was not active. He also told her that she could not work overtime because she was ADA. And, eventually,

he told her not to bother putting her name on the overtime list anymore. When plaintiff contacted Director Reierson, Director Reierson emailed plaintiff's supervisors to confirm that plaintiff could work overtime if she worked an assignment within her restrictions. Plaintiff testified that she did not have any issues with being denied overtime after she contacted Director Reierson.

Defendant denies this and says that plaintiff has presented insufficient evidence to show that she suffered an adverse action because of her disability and that the discrimination was intentional. Defendant says that the only evidence plaintiff can point to which would suggest that she was discriminated against on the basis of her disability are the alleged statements made by her supervising lieutenant. Defendant argues that the statements made by plaintiff's supervising lieutenant are hearsay.[30] The Court agrees. Without these statements, the Court finds that no reasonable jury could find that defendant discriminated against plaintiff on the basis of her disability.

### C.      FMLA

Plaintiff says defendant was on notice of plaintiff's condition, penalized her for absences related to her condition, and did not offer reasonable time off (albeit unpaid) so that she could avoid incurring a penalty. Defendant responds that plaintiff's claim does not amount to discrimination under the ADA because only the arbitrator, not defendant, had the authority to decide whether plaintiff would be compensated or reimbursed for back pay. While the decision to compensate plaintiff for backpay may be at the discretion of the arbitrator, a reasonable jury could find that plaintiff would not have incurred these absences and subsequent discipline (in the form of unpaid days because she had exhausted available leave) had defendant offered her reasonable time off. Given this, the Court finds that a triable issue of fact exists. Accordingly, defendant's motion for summary judgment as to this claim is denied.

## V.      Retaliation

To prove her retaliation claim, plaintiff must show (1) she engaged in statutorily protected activity; (2) she suffered an adverse action; and, (3) a causal connection between the two." *Koty v. DuPage Cty., Ill.*, 900 F.3d 515, 519 (7th Cir. 2018) (quoting *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011)). If a plaintiff can satisfy this burden, the burden shifts to the defendant to show a non-invidious reason for the adverse employment action. *Id.* (quotation omitted). If the defendant can meet this burden, then the plaintiff must show that the defendant's proffered reason was pretextual. *Id.* (quotation omitted). "Pretext 'involves more than just faulty reasoning of mistaken judgment on the part of the employer; it is [a] lie, specifically

---

[30] The statements made by plaintiff's supervising lieutenant conceivably could be non-hearsay pursuant to FRE 801(d)(2)(D), but there is no developed argument or record to support such an evidentiary conclusion. *See Hildreth v. Butler*, 960 F.3d 420, 429 (7th Cir. 2020) (finding no abuse of discretion where district court did not consider statements as non-hearsay, noting that "[w]hile the precise reach of Rule 801(d)(2)(D) is sometimes difficult to discern, the inquiry is easy where, as here, the affidavit does not establish an employment relationship and does not establish the statements were made within the scope of such relationship") (internal quotations omitted). While the lieutenant's employment status is relatively self-evident, the statements made were not shown to be within the scope of the lieutenant's employment duties with the Sheriff's Office (*i.e.* whether plaintiff was eligible for overtime).

a phony reason for some action.'" *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017).

Plaintiff contends that defendant allowed her to work overtime before she went on disability leave but inexplicably prevented her from working overtime after she returned from disability leave in August of 2015 and had ADA accommodations. When plaintiff asked her employer why she was not allowed to work overtime, she says her supervisors told her that her TWA and/or ADA status prevented her from working overtime. Plaintiff contends that her employer's inability to put forth a legitimate nondiscriminatory reason, her employer's departure from its own policy (medical restrictions should not prohibit an employee from working overtime), and the timing is enough for a reasonable jury to find that plaintiff was not allowed to work overtime in retaliation for needing a reasonable accommodation and/or because she is a qualified individual with a disability under the ADA.

Defendant counters that a jury could not reasonably conclude that defendant retaliated against plaintiff for her alleged protected conduct between August of 2015 and October of 2016 because no decisionmaker had knowledge of plaintiff's alleged denial of overtime prior to October of 2016. In support, defendant cites *Cervantes v. Ardagh Group*, 914 F.3d 560 (7th Cir. 2019) for the proposition that a retaliation claim fails absent evidence that supervisors were aware of the protected activity. Defendant also objects to the statement allegedly made by plaintiff's lieutenant as inadmissible hearsay. A party may only rely on admissible evidence to defeat a motion for summary judgment; a court may not consider inadmissible hearsay. *Carlisle v. Deere & Co.*, 576 F.3d 649, 655 (7th Cir. 2009). For the reasons previously noted, the Court agrees that this statement is inadmissible hearsay and will not consider it for the purpose of this motion. Additionally, defendant says that Director Reierson contacted plaintiff's supervisors about the overtime issue, which shows that defendant acted in good faith to rectify the alleged issue and acted without any retaliatory intent or animus.

Here, the evidence shows that plaintiff was given overtime assignments before she took a medical leave of absence and had ADA restrictions, but she was allegedly denied overtime when she returned from leave. According to CCSO policy, having medical restrictions or appearing on a modified duty list or the ADA list should not render an officer ineligible for overtime, and an officer with medical restrictions should be able to work overtime in any position so long as it fits the officer's restrictions. Plaintiff placed her name on the overtime list several times between October of 2015 and September of 2016. Plaintiff's overtime issue was eventually addressed when she contacted Director Reierson in September and October of 2016. Director Reierson then contacted plaintiff's supervisors to inform them that plaintiff could work overtime in assignments that met her restrictions.

Plaintiff has not presented any direct evidence showing that a supervisor/someone with decision-making authority denied her overtime requests because she sought accommodations under the ADA. *See Cervantes*, 914 F.3d at 566-567 (plaintiff is unable to show a "causal connection" when he failed to show that he notified his supervisors of his complaints); *see also King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017) (plaintiff failed to identify whose responsibility it was to determine overtime or whether that individual would have been aware of plaintiff's protected activity). While plaintiff alleges that her supervising lieutenant told her that

she is not allowed to work overtime if she is TWA or ADA and that she should not bother putting her name on the overtime list anymore, plaintiff does not show that the Lieutenant had the ability to determine and/or assign overtime. However, plaintiff has presented two forms of circumstantial evidence that support her claim. First, plaintiff has presented timing evidence – *i.e.* that plaintiff was afforded the opportunity to work overtime prior to seeking ADA accommodations but not after she received ADA accommodations. While timing alone may be insufficient to survive summary judgment, (*see Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("[a]t the outset, we note that suspicious timing will rarely be sufficient in and of itself to create a triable issue" in retaliation claims) (internal quotations omitted)), here plaintiff has presented another set of circumstantial events that add to her timing argument. When plaintiff eventually contacted Director Reierson, the evidence shows that Director Reierson took action by contacting plaintiff's supervisors and informing them that she could work overtime assignments that met her restrictions. A reasonable inference to be drawn here is that plaintiff was denied overtime opportunities until Director Reierson intervened on plaintiff's behalf. This series of events may show that a decision maker who allotted overtime wrongly determined that plaintiff could not work overtime until such action was corrected by Director Reierson. *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ('[c]lose temporal proximity provides evidence of causation . . . and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link").[31] Accordingly, the Court denies defendant's motion for summary judgment as to this claim.

## CONCLUSION

For the foregoing reasons, the Court finds that genuine issues of material fact exist as to plaintiff's FMLA and retaliation claims. Accordingly, the Court grants in part and denies in part defendant's motion for summary judgment. Status hearing set for 11/25/2020 is stricken and reset to 12/16/2020 at 10:00 a.m.

**SO ORDERED.**                                    **ENTERED:  November 25, 2020**


*M. David Weisman*
**M. David Weisman**
**United States Magistrate Judge**

---

[31] Defendant's suggestion that Director Reierson's intervention on plaintiff's behalf demonstrates lack of a retaliatory motive, we believe, misses the mark. The CCSO policy that employees who had an ADA accommodation were still eligible for overtime shows that the CCSO had a legally compliant policy. The circumstantial evidence presented by plaintiff, however, shows that plaintiff (as an individual employee) may have been retaliated against because she sought an ADA accommodation. *Cf. Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action [in defending a retaliation claim], he is entitled to summary judgment. Otherwise there must be a trial.") Here, defendant has not presented "unrebutted evidence of a noninvidious reason" for plaintiff being denied overtime. Rather, defendant asks this Court to presume that any denial of overtime was because of an administrative misunderstanding. Perhaps that is true. But, Director Reierson may also have had to intervene on plaintiff's behalf to stop the retaliatory conduct. In short, decision of the "causal connection" must be left to a jury.